## LUCIA MINING CO. v. EVANS et al.

(Supreme Court, Appellate Division, Second Department.    October 6, 1911.)

1. CORPORATIONS (§ 307*)—OFFICERS—FIDUCIARY RELATION.
   One who is director and counsel for a corporation bears a fiduciary relation to it.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1350, 1351; Dec. Dig. § 307.*]

2. TRUSTS (§ 102*)—CONSTRUCTIVE TRUSTS—EXISTENCE.
   That a mine was purchased with corporate funds in the hands of the corporation's director and counsel shows a constructive trust in favor of the corporation.
   [Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. § 102.*]

3. TRUSTS (§ 354*)—RESULTING TRUSTS—RIGHTS OF CESTUI QUE TRUST.
   The cestui que trust, under a trust resulting from the purchase of property by one standing in a fiduciary relation, can follow the trust funds and take the property into which they have been changed if the rights of bona fide purchasers for value have not intervened.
   [Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 527, 528; Dec. Dig. § 354.*]

4. EVIDENCE (§ 236*)—ADMISSIONS BY DECEDENT—ADMISSIBILITY.
   Oral admissions by a decedent are unsatisfactory, but admissible, evidence.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 876–882; Dec. Dig. § 236.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. COURTS (§ 17*)—JURISDICTION— PROPERTY IN FOREIGN COUNTRY.

A court of equity had jurisdiction to decree respecting property in a foreign country, if it has jurisdiction of the persons of the defendants, in a case of fraud, trust, or contract.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 46–50; Dec. Dig. § 17.*]

6. COMMON LAW (§ 17*)—ORAL EVIDENCE.

If the law of succession in a foreign country depends on unwritten or common law under Code Civ. Proc. § 452, that law can be proved by oral evidence.

[Ed. Note.—For other cases, see Common Law, Cent. Dig. §§ 13, 17; Dec. Dig. § 17.*]

7. EVIDENCE (§ 81*)—PRESUMPTIONS—FOREIGN LAWS.

There is no presumption that the common law is in force in Mexico on the question of succession.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 102; Dec. Dig. § 81.*]

8. EVIDENCE (§ 81*)—PRESUMPTIONS—LAWS OF FOREIGN COUNTRIES.

Where the law of a foreign country relating to succession is not shown, the law of the forum will be applied.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 81.*]

9. CORPORATIONS (§ 506*)—PARTIES TO ACTIONS.

Where one corporation owns all the stock of another, the latter may be said to represent it in an action to enforce a constructive trust.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 506.*]

Thomas, J., dissenting.

Appeal from Special Term, Kings County.

Action by the Lucia Mining Company against Guillermo I. Evans and another. From a judgment dismissing its complaint, plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Charles M. Demond (Marshall Snyder, on the brief), for appellant. Paul E. Mead, for respondents.

JENKS, P. J. In 1901 Andy Evans took the title to the Castellano mines in the Republic of Mexico from Hartmann. He then resided in Mexico and was the president, general manager, and legal representative of the plaintiff, a corporation of West Virginia, authorized to acquire mines and to carry on business in that country. He also appears as an investor in mining properties in Mexico and as the owner of several mines there. The plaintiff complains that the Castellano mines were thus purchased by it from Hartmann, and that the title was taken by Evans in trust for its sole benefit. In January, 1902, Evans conveyed an undivided half interest in the Castellano mines to Logan, who in November, 1902, conveyed that interest to the plaintiff. Evans died in the city of New York in March, 1903, intestate, leaving a widow and these two infant defendants as his only heirs at law and next of kin. In March, 1910, the widow, "recognizing the plaintiff's title" (according to the complaint), conveyed an undivided fourth part of the Castellano mines to the plaintiff, who now seeks a decree that that property is that of the plaintiff, that

Evans took title thereto and held it only in trust, that upon his death an undivided fourth part vested in the defendants, and that they execute a deed of conveyance thereof to the plaintiff. At the close of the evidence the learned Special Term dismissed the plaintiff, who now appeals from the judgment thereupon entered.

Logan was a lawyer residing in the city of New York, was a director and counsel for the plaintiff, and was president of the San Luis Mining Company, also a corporation created under the laws of West Virginia. The principal actors in the transaction of purchase were Evans and Logan. Logan is dead. The plaintiff read in evidence much correspondence between Logan and Evans on the subject of this purchase. The learned Special Term was moved to dismissal largely by its conclusion that:

"The letters are equally consistent with the claim of the defendants that the mines in question were purchased, not for the company, but for account of Mr. Evans and Mr. Logan, one-half each."

I think that the learned court correctly judged the correspondence as to the intention of Evans and of Logan in making the purchase. It is true that some weeks thereafter Logan suggested as a policy, not as right, that the mine should be turned in to the corporations; but, although Evans acceded, he insisted that there must be compensation to him and Logan. I do not find that Logan then protested, as if the plaintiff or the San Luis Company had been the real purchaser; but, on the contrary, he treated the contention of Evans as natural, just to themselves, and essential to any scheme of absorption.

[1] But I think that what Evans or Evans and Logan intended to do, or what they did in formal way, or what they thought they had done about this purchase, or attempted to do thereafter, is of little moment and quite aside from a controlling feature of this case, for Logan's relation to the plaintiff was fiduciary in its character. Hoyle v. Plattsburgh & Montreal R. R. Co., 54 N. Y. 314–328, 13 Am. Rep. 595. See, too, Reeves on Real Property, 363; Perry on Trusts (6th Ed.) §§ 202, 207; Story's Equity Jurisprudence (13th Ed.) §§ 310, 311. And the evidence indicates a case of a constructive trust in favor of the plaintiff. In his first letter to Logan relative to this mine, Evans informs him that the price is $20,000, $5,000 cash, $5,000 in 30 days, and $10,000 in 60 days, both from September 26, 1901. And he also wrote that for the first $5,000 he had time until Logan, after the receipt of that letter, could telegraph that Evans might draw on him for that sum; and he added:

"The two drafts I give one for five thousand and thirty days and the other for ten thousand and sixty days, signed Andy Evans, Mgr. San L. M. Co. This I had to do but with the agreement that should you object the drafts will be destroyed. You understand I do not want this property (The Castellano) for the San Luis Co. I bought it for you and me to put into our new company or as we may agree on later on. But if you should want nothing to do with this, can you help me out? Let me draw on you for the first five thousand and afterwards indorse the two drafts. You can take my San Luis stock as security."

Logan's answer, so far as it appears, was a telegram:

"Approve your purchase, but make first draft ten days."

A sight draft, dated October 8, 1901, for $5,000, drawn by Evans on Logan, 27 William street, New York City, was accepted by Logan on October 14, 1901, and paid on October 24, 1901, by check drawn by Logan, attorney. A draft for $5,000, drawn on September 26, 1901, by Hartmann, the seller of the mine, on Andy Evans, manager of the San Luis Mining Company, to be paid at 27 William street, New York, was accepted by Evans, was accepted on October 28, 1901, by the San Luis Mining Company, by Logan, president, and was paid on that day by check drawn by Logan, attorney. A draft for $10,000, drawn on September 26, 1901, by the said Hartmann on Andy Evans, manager of the San Luis mine, to be paid at 27 William street, New York City, was accepted by Evans, was accepted on October 21, 1901, by the San Luis Mining Company, by Logan, president, and was paid on November 21, 1901, by check drawn by Logan, attorney. The testimony of Martin, secretary and treasurer, and a director of plaintiff, who was entirely familiar with its affairs, is that the San Luis Mining Company owned all the stock of the plaintiff; that when the plaintiff wished moneys in 1901 it drew upon the treasurer of the San Luis Company; that the offices of the two companies and that of Logan were at 27 William street; that the San Luis Mining Company kept its moneys in a special bank account of Logan, attorney; and that when checks were drawn by Logan, attorney, to meet these drafts, they represented funds of the San Luis Mining Company.

The evidence is perhaps not so clear as to the first $5,000, inasmuch as the draft was by Evans upon Logan directly. But the checks to pay all of the drafts were drawn upon the same bank, and apparently upon the same account. It does appear, then, that Evans, as to two of the drafts, "signed" them, or caused them to be drawn upon him as manager of the San Luis Company. As we have seen, he wrote that he had to do this, which permits the inference that he could not have carried out the transaction personally. And, moreover, it does appear that those drafts were accepted by the San Luis Company and were paid out of its funds.

[2, 3] I think that this evidence, uncontradicted and unexplained, plainly traces and clearly identifies corporate funds in the hands of a fiduciary, used by him in the purchase of this mine, the title to which was taken by Evans, and later as to one-half by him; and that thereupon the cestui que trust could follow the funds and take the property into which they had been changed, provided the rights of bona fide purchasers for value were not in its way. See Reeves on Real Property, §§ 361–363, and many authorities cited; Perry on Trusts (6th Ed.) § 127; Pomeroy's Equity Jurisprudence (3d Ed.) § 422; Russell v. Allen, 10 Paige, 251; Gerard's Titles to Real Estate (5th Ed.) 284; and cases cited. The title was taken by Evans and remained in him save as to the one-half conveyed by him to Logan. I cannot see, upon the record, that Evans has any status like unto that of an innocent purchaser for value. He did not furnish any of the consideration, and on the other hand he "signed" two of the drafts as manager of the San Luis Company, or in fact they were at his instance drawn upon him as such manager.

Plaintiff's witness Martin testifies that in 1902 she and some of the directors, when on a visit to the plaintiff's properties, went out to look at the Castellano mines, and that from a viewpoint Evans pointed out the location of the mines, saying, "These are our mines, but we cannot work them now," etc.

[4] It is true that oral admissions of the dead are regarded as "a dangerous and unreliable species of evidence at best" (Sheldon v. Sheldon, 133 N. Y. 1-8, 30 N. E. 730, 732); but nevertheless they are evidence. The only other bit of evidence is proof that the plaintiff paid the taxes upon these mines; but that was subsequent to 1902.

There appears a single entry in the journal of the San Luis Company:

"Mining properties, Walter S. Logan, cash paid for Castellano mines, $20,000."

This stands isolated, and without explanation; neither that journal, any other entry therein, nor any other account book was read in evidence. But the date of the entry is May, 1902, and the purchase was made in September and October of 1901. In the absence of any explanation, there was too much manipulation in the time intervening to articulate this entry with the act of payment by Logan. During that period the scheme formulated by Logan, whereby the corporation should absorb the mine, had been approved by Evans. Logan had written that he would call meetings of the directors and stockholders respectively to adopt it. We are not informed whether this was done. But we do know that before that entry Logan had conveyed his half interest to the plaintiff by deed wherein the consideration was blank and wherein it was recited that he as vice president, in the name of the company and by authority of the board of directors, accepts the sale made by Walter S. Logan to the said company. And we also have the testimony of Martin that the company did not sue before because it was supposed that the title had been put into the plaintiff; that Negrete, attorney for the company in Mexico, reported that it had been done; and that Ross, the successor of Evans, reported that the titles were "all right." If it may hereafter be contended that this entry is ratification of Logan's original action and all of the incidents thereof, that question would still involve inquiry as to the full knowledge by the corporation of all the material facts of the transaction and whether it had been fully aware of the imperfections thereof, of its own rights to impeach it, or ought and might with reasonable diligence have known these things, and whether it had acted deliberately with the intention of ratification. See Pomeroy's Equity Jurisprudence, § 964. It may well be that when Logan conveyed he supposed that Evans had conveyed also, or was ready to do so, and that this credit related to such conveyances and supposed conveyances or promised conveyances to the plaintiff. Indeed, upon the new trial the full history of the mine after its original purchase in September, 1901, may be revealed, and thus much that is uncertain may be made sure and much that is obscure be made clear. It is but just to Logan to say that if, as the record indicates, he made over his interest without compensation, he acted in the line of duty. Such surmise is a satisfaction.

[5] Notwithstanding that the property is situate in the Republic of Mexico, a court of equity of this state could decree with respect to that property as against the defendants, if it had obtained jurisdiction of their persons, in a case of fraud or of trust or of contract. See Chase v. Knickerbocker Phosphate Co., 32 App. Div. 403, 53 N. Y. Supp. 220, per Cullen, J., and authorities there cited. See, too, Heyl v. Taylor, 137 App. Div. 641, 122 N. Y. Supp. 279.

[6] It did not appear what kind of "law" regulates succession in the state of Durango, Mexico. If unwritten or common law, then it could have been proved as a fact by oral evidence in the fashion attempted by plaintiff. Section 942, Code of Civil Procedure.

[7] But there is no presumption that in the state of Mexico the common law was in force. Savage v. O'Neil, 44 N. Y. 298. And, if succession was regulated by statute, then the plaintiff failed to prove the statute.

[8] Under such circumstances our own law would furnish the rule in this litigation. Savage v. O'Neil, supra.

[9] It may be noted that there are two corporations mentioned, of which both were formed in West Virginia. But as the San Luis Company, as I have said, is the owner of all the stock of the Lucia Company, the Lucia Company as plaintiff may be said to represent it. Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Hawkins v. Glenn, 131 U. S. 319, 9 Sup. Ct. 739, 33 L. Ed. 184; Glenn v. Liggett, 135 U. S. 533, 10 Sup. Ct. 867, 34 L. Ed. 262.

I advise that the judgment be reversed, and that a new trial be granted; costs to abide the final award of costs.

CARR, WOODWARD, and RICH, JJ., concur.

THOMAS, J. (dissenting). The letters show that the Castellano grant was not bought for the San Luis Company, but for Logan and Evans. Evans agreed to convey one-half to Logan, and did so. Evans had an earlier idea of forming a new company for certain mines, and then Logan broached the matter of enlarging the capital and turning the mines over to the San Luis; but that was only tentative, and Logan so understood. The one-half interest in the Castellano was to be conveyed to Logan in addition to other mines bought by Evans. I do not understand that the plaintiff claims the other mines. In fact Evans had large personal holdings of mines, to which the plaintiff makes no claim. The plaintiff intended to put properties bought for the plaintiff in at cost and properties owned by Evans and Logan at their fair value. This arrangement seems to have been definite. Evans did draw on Logan for $5,000, and drafts drawn on Evans as manager of the San Luis Company were accepted by him and by the company through Logan, president, and all were paid from the company's money; but Evans' letter of September 28th shows that he was constrained by the urgency of the negotiation to do this, and that he did not buy for the San Luis Company. After Evans had conveyed a one-half interest to Logan, the latter conveyed it to the plaintiff and received a credit for $20,000, which precisely offsets the money drawn

by Logan to aid Evans. If the plaintiff expected the whole title for $20,000, why did it accept half for that sum? Logan was the chief power in the company; he understood what its rights were, and his recognized ability enabled him to protect its finances. It is evident that the company was satisfied to accept one-half of the mine for $20,-000.

The judgment should be affirmed.

---

#### EDGAR v. BROOKLYN HEIGHTS R. CO. et al.

(Supreme Court, Appellate Division, Second Department.   October 6, 1911.)

1. MASTER AND SERVANT (§ 278*)—STREET RAILROADS—INJURY IN CAR BARN—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

    In an action against a street railway company for injury to a depot master in a car barn, caused by a car shifter operated on a cross-rail striking him, evidence *held* insufficient to show negligence of the company in failing to provide a reasonably safe place for work or to promulgate rules or to equip the shifter with a brake or headlight.

    [Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 107*)—SAFETY OF PLACE OF WORK.

    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*]

3. MASTER AND SERVANT (§ 264*)—NEGLIGENCE—PLEADING.

    An employer's negligence in failing to promulgate rules as affecting liability for personal injury must be pleaded and proved.

    [Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 264.*]

4. MASTER AND SERVANT (§ 265*)—DISCHARGE OF EMPLOYER'S DUTY—PRESUMPTION.

    In the absence of evidence on the question, it is not presumed that an employer has failed to discharge any of his duties.

    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908; Dec. Dig. § 265.*]

5. MASTER AND SERVANT (§ 219*)—RISKS ASSUMED BY EMPLOYÉ.

    An employé suing for negligent personal injury under the common law, and not under the employer's liability act (Consol. Laws 1909, c. 31), is deemed to have accepted the obvious risk of his employment.

    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 610–624; Dec. Dig. § 219.*]

Appeal from Trial Term, Kings County.

